UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,               Criminal Action No. 15-20774
                                     Honorable John Corbett O'Meara
                                     Magistrate Judge David R. Grand

v.

KEITH COLLIER,

        Defendant.

_____/

## REPORT AND RECOMMENDATION TO DENY DEFENDANT'S MOTION TO SUPPRESS EVIDENCE BASED ON ILLEGAL SEARCH AND SEIZURE [58]

On December 3, 2015, Keith Collier ("Collier") was charged in an indictment with: (1) Count One: Felon in Possession of a Firearm, 18 U.S.C. § 922(g)(1); (2) Count Two: Possession with Intent to Distribute a Controlled Substance (Heroin), 21 U.S.C. § 841(a)(1); (3) Count Three: Possession with Intent to Distribute a Controlled Substance (Cocaine), 21 U.S.C. § 841(a)(1); (4) Count Four: Possessing a Firearm in Furtherance of a Drug Trafficking Crime, 18 U.S.C. § 924(c); and (5) Count Five: Felon in Possession of a Firearm, 18 U.S.C. § 922(g)(1). (Doc. #1). On February 6, 2017, Collier filed a motion to suppress evidence (Doc. #58), which has been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (Doc. #59). The government filed a response (Doc. #63), and Collier filed a reply. (Doc. #65). On August 21, 2017, the Court held an evidentiary hearing and heard oral argument.

## I.    RECOMMENDATION

For the following reasons, the Court **RECOMMENDS** that Collier's Motion to Suppress Evidence Based on Illegal Search and Seizure **(Doc. #58)** be **DENIED**.

## II.    REPORT

## BACKGROUND

### A.    The GPS Warrant

On April 27, 2015, Drug Enforcement Administration ("DEA") Agent Shohn T. Joyner ("Joyner")[1] swore to an affidavit before 19th District Court Judge Mark W. Somers, the purpose of which was to install a GPS tracking device on a 2005 Cadillac that was registered to and used by Collier ("Collier's vehicle").  (Doc. #58-1).  Joyner believed that Collier's vehicle was "being used in a conspiracy to distribute narcotics in violation of the State of Michigan Law and Federal Law."  (*Id.* at ¶¶ 2, 4, 27).  Joyner averred that the affidavit established probable cause that (1) Collier had violated and was continuing to violate the controlled substance laws of the United States – specifically, distribution and possession with intent to distribute controlled substances, including drug trafficking; and (2) the monitoring of a GPS tracking device installed on Collier's vehicle would advance the investigation and lead to admissible evidence, such as (a) evidence of a conspiracy to distribute controlled substances, (b) the locations used by a drug trafficking organization to store heroin and other controlled substances, and (c) the identification of individuals engaged in the conspiracy and other crimes.  (*Id.* at ¶¶ 3, 5, 10, 27).

In support of the GPS tracking search warrant application, Joyner referenced information obtained from a confidential informant and cooperating defendants (*id.* at ¶¶ 11-15), Collier's criminal history (*id.* at ¶ 16), and multiple surveillances conducted by "DEA Detroit Group 2" ("Group 2") in April 2015.  (*Id.* at ¶¶ 17-22).  Judge Somers signed the GPS tracking search warrant (the "GPS warrant") on that same day, authorizing authorities to install a GPS tracking device on Collier's vehicle and to monitor the signals from the device "for a period of no longer

---

[1] Joyner testified that he was a DEA agent for a little over five years, but he is now with the Federal Bureau of Investigation ("FBI").

than of 60 days." (*Id.* at 1). At some point thereafter, the GPS device was installed on Collier's vehicle.

> **B.**     **The Summit/Montana Warrant**

On May 20, 2015, one month after the GPS warrant in question was issued, Special Agent Bryan Sartori ("Sartori") swore to an affidavit before Judge Somers to obtain a search warrant for two locations: a house located at 30249 Summit Drive in Farmington Hills, Michigan and a house located at 202 W. Montana Street in Detroit, Michigan (the "Summit/Montana warrant"). (Doc. #58-3). Sartori averred that the affidavit established probable cause that (1) Collier was previously and currently engaging in the distribution of controlled substances; (2) a search of the Summit Drive and Montana Street locations would "enable the government to more fully understand the scope of the drug conspiracy, its members and their respective roles"; and (3) these two locations would contain evidence of violations of the State of Michigan's narcotic statutes and of federal drug statutes 21 U.S.C. §§ 841 and 846. (*Id.* at ¶¶ 25-26).

The Summit/Montana warrant affidavit relied on confidential informants, a cooperating defendant, and surveillances previously referenced by Joyner in the GPS warrant affidavit, (*id.* at ¶¶ 8-10, 12-13, 16-19), along with details of a controlled buy of heroin from Collier. (*Id.* at ¶ 15). The affidavit also contained a single paragraph referencing the electronic surveillance results from the GPS tracker that had been installed on Collier's vehicle, and which indicated that Collier resided at the Summit Drive address. (*Id.* at ¶ 23). Importantly, however, the affidavit noted that surveillance conducted in connection with the controlled buy showed that immediately before the buy, Collier had been at "his residence located at 30249 Summit Drive,"

and that he drove from there to 202 W. Montana where he consummated the narcotics sale.[2]  (*Id.* ¶ 15).  Judge Somers issued the search warrant for the Summit Drive and Montana Street locations the same day it was presented to him.

The next day, on May 21, 2015, DEA agents searched the two locations.  (Doc. #53 at 2).  At Summit Drive, the agents found two handguns; approximately $200,000 in cash; mail addressed to Collier; and a water bill for the Montana Street address.  (*Id.*).  At Montana Street, the agents found a loaded handgun; heroin, crack, powdered cocaine, and Fentanyl; drug packaging materials; and latex gloves, Ziploc bags, a strainer, rubber bands, tape razors, face masks, a coffee grinder, measuring cups, and cutting agents.  (*Id.*).  On October 2, 2015, the Michigan State Police – who conducted DNA testing on the items found at the Montana Street address – confirmed that Collier's DNA was found in one of the used face masks.  (*Id.*).  A criminal complaint was issued in this Court on October 21, 2015, and Collier was arrested on November 19, 2015.  (*Id.*).  He was later indicted on the charges noted above.

## COLLIER'S MOTION TO SUPPRESS

On February 6, 2017, Collier filed the instant motion to suppress.  (Doc. #58).  He argues that because the GPS warrant was signed by a state court judge and not a federal magistrate judge, it was obtained "unconstitutionally" and in violation of Fed. R. Crim. P. 41.  (*Id.* at 2).  In his view, any evidence derived from the GPS warrant should therefore be suppressed, including evidence "stemming" from the GPS tracker.  (*Id.*).  In particular, Collier believes that the evidence seized from the Summit Drive and Montana Street locations should be suppressed

---

[2] It is also important to note that the GPS tracker results did not lead to the discovery of the Summit Drive and Montana Street addresses where the evidence Collier now seeks to suppress was recovered.  Prior to obtaining the GPS warrant, the officers investigating Collier already had knowledge of a connection between Collier and these addresses, which Joyner referenced in the affidavit he submitted in support of his GPS warrant application.  (Doc. #58-1 at ¶¶ 4, 18, 19, 21, 22, 24).

because this evidence was obtained through the Summit/Montana warrant that relied on the GPS tracker's results.  (*Id.*).  Moreover, Collier argues that even if a state court judge had authority to issue the GPS warrant, the evidence should be suppressed because the GPS warrant affidavit lacked probable cause.  (*Id.*).  For the reasons discussed below, the Court finds that Collier's arguments lack merit, and his motion to suppress should be denied.

**APPLICABLE LEGAL STANDARDS**

Generally, before authorities may search a person's home or property, they must obtain a warrant.  *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007).  In turn, the Fourth Amendment provides that "no Warrant shall issue, but upon probable cause, supported by Oath or affirmation."  U.S. Const. amend. IV.  When considering an application and affidavit for a search warrant, "the task of the issuing magistrate judge is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  Thus, "[a] warrant will be upheld if the affidavit provides a 'substantial basis' for the issuing magistrate to believe 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  *Smith*, 510 F.3d at 652 (quoting *Gates*, 462 U.S. at 238).

As the Supreme Court explained in *Gates*, 462 U.S. at 232, probable cause is a "fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules."  As a result, "[c]ourts should review the sufficiency of the affidavit in a commonsense, rather than hypertechnical manner."  *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001).  "[R]eview of an affidavit and search

warrant should rely on a 'totality of the circumstances' determination, rather than a line-by-line scrutiny." *Id.* (quoting *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en banc)).

Further, "[t]o justify a search, the circumstances must indicate why evidence of illegal activity will be found 'in a particular place.' There must, in other words, be a 'nexus between the place to be searched and the evidence sought.'" *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (quoting *United States v. Van Shutters*, 163 F.3d 331, 336-37 (6th Cir. 1998)). "In addition, probable cause must exist at the moment that the warrant is issued and the evidence supporting it cannot be stale." *United States v. Whetstone*, No. 09-20348, 2009 WL 4506430, at *3 (E.D. Mich. Nov. 25, 2009) (citing *Sgro v. United States*, 287 U.S. 206, 210 (1932)). "There is no fixed time limit regarding the staleness of evidence and a court must consider the following variables: 'the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), the place to be searched (mere criminal forum of convenience or secure operational base?), etc.'" *Id.* (quoting *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998)).

"[R]eviewing courts are to accord the magistrate's determination 'great deference.'" *Allen,* 211 F.3d at 973 (quoting *Gates*, 462 U.S. at 236). Where a warrant application relies on confidential informants, "the affiant need only specify that the confidential informant has given accurate information in the past to qualify as reasonable." *United States v. Martin*, No. 15-20544-05, 2016 WL 4493675, at *2 (E.D. Mich. Aug. 26, 2016) (quoting *Greene*, 250 F.3d at 480). "[A]n officer's 'training and experience' may [also] be considered in determining probable cause." *Id.* at *3 (quoting *United States v. Crockett*, 548 F. Supp. 2d 435, 441-42 (E.D. Mich. 2008); citing *U.S. v. Martin*, 920 F.2d 393, 399 (6th Cir. 1990)).

## ANALYSIS

### A. Collier has Not Shown that Joyner was Required to Submit the GPS Tracking Warrant Application to a Federal Judge

#### i. Fed. R. Crim. P. 41

Fed. R. Crim. P. 41(b) gives "guidelines for determining the proper venue for a warrant application" and provides in relevant part:

> **(b) Venue for a Warrant Application.** At the request of a federal law enforcement officer or an attorney for the government:
>
> (1) a magistrate judge with authority in the district – or if none is reasonably available, a judge of a state court of record in the district – has authority to issue a warrant to search for and seize a person or property located within the district;
>
> ***
>
> (4) a magistrate judge with authority in the district has authority to issue a warrant to install within the district a tracking device; the warrant may authorize use of the device to track the movement of a person or property located within the district, outside the district, or both . . . .

Fed. R. Crim. P. 41(b); *United States v. Kahler*, 236 F. Supp. 3d 1009, 1017 (E.D. Mich. 2017).

In their motions, both parties reference the 2006 Advisory Committee Notes, which state:

> Because the authorized tracking may involve more than one district or state, the Committee believes that only federal judicial officers should be authorized to issue this type of warrant. Even where officers have no reason to believe initially that a person or property will move outside the district of issuance, issuing a warrant to authorize tracking both inside and outside the district avoids the necessity of obtaining multiple warrants if the property or person later crosses district or state lines.

Fed. R. Crim. P. 41 2006 Amendment Subdivision (b) Advisory Note.

Collier argues that the GPS warrant in question is invalid because "only a federal magistrate judge . . . has authority to issue a warrant to install within the district a tracking device" and Rule 41 does not authorize federal law enforcement officers to seek tracking

warrants from state court judges. (Doc. #58 at 10). The government argues that Rule 41 does not apply to state court judges because the Federal Rules of Criminal Procedure "only 'govern the procedure in all criminal proceedings in the United States district courts'" and "court," it points out, "is defined as 'a federal judge performing functions authorized by law.'" (Doc. #63 at 8) (citing Fed. R. Crim. P. 1(a)(1), (b)(2)). It is therefore the government's position that Michigan law applies instead, under which it contends that the tracking warrant was valid. (*Id.*). Both parties' positions are somewhat flawed.

Rule 41 "only applies to federal law enforcement endeavors, not to warrants for state investigations." *United States v. Hopper*, 58 F. App'x 619, 626 (6th Cir. 2003). "The key inquiry . . . is [therefore] whether the search . . . was a federal search implicating Rule 41, or merely a state search to which Rule 41 would not apply." *Id.* But, government agents cannot turn a federal proceeding into a state proceeding simply by asking a state court judge to handle the matter. "When a state judge acts under the authority of a federal rule [such as Rule 41], the 'proceeding' is a federal proceeding."[3] *United States v. Claridy*, 601 F.3d 276, 281 (4th Cir. 2010) (citing Fed. R. Crim. P. 1(a)(2)). Conversely, where

> federal and state agencies cooperate and form a joint law-enforcement effort, investigating violations of both federal and state law, an application for a search war[]rant cannot categorically be deemed a 'proceeding' governed by the Federal Rules of Criminal Procedure, based simply on the role that the federal law-enforcement officers played *in the investigation*. Such an investigation is conducted on behalf of both sovereigns, and its object is to reveal evidence of crime – be it federal crime or state crime.

---

[3] In this case, while the GPS warrant affidavit and related paperwork referenced Fed. R. Crim. P. 41, those documents also specifically indicated that agents were targeting violations of both State of Michigan and federal law, noted that the warrant was limited to monitoring "within the State of Michigan," and referenced certain Michigan search warrant statutes, including M.C.L. §§ 780.651, 780.654, and 780.655. (*See, e.g.*, Doc. #58-1 at 2, 12; *id.* at ¶¶ 2, 3, 27, 28).

*Id.* (internal citation omitted) (emphasis in original). Thus, when state and federal law enforcement officers work together in a joint task force, as was the case here, whether Rule 41 applies depends not on mere labels, but on the facts and circumstances of the particular case.

> The question of what law governs the application for a warrant . . . turns on the nature of the *judicial proceeding* undertaken during the course of the investigation, such as a proceeding initiated by the application for a search warrant. Therefore, when a member of a joint task force initiates a proceeding in state court to obtain a search warrant in furtherance of the joint investigation, it is not only relevant to understand the role of federal officers in obtaining the warrant and conducting the search, but it is also *necessary* to review the details of the proceeding itself to determine what law the warrant will serve and the scope of the warrant. Search warrants obtained during a joint federal-state investigation may be authorized by Federal Rule 41(b) or by state law and may serve to uncover violations of federal law as well as state law.

*Id.* at 282 (citing *United States v. Sellers*, 483 F.2d 37, 43 (5th Cir. 1973)).

> **ii.      Testimony from the Evidentiary Hearing Did Not Establish that Joyner's Application for a GPS Tracking Warrant was Made Pursuant to a Federal Proceeding, and He Therefore Was Not Required to Seek the Warrant from a Federal Judge**

The evidence before the Court does not establish that the GPS warrant in question was obtained through a "federal" proceeding that implicated Rule 41. Indeed, Joyner's evidentiary hearing testimony shows that at the time he applied for the GPS warrant, the investigation had not yet risen to that level. Joyner testified that although he is a federal agent, he is authorized "by statute" to work on state law cases. Joyner testified that he was part of Group 2, a joint task force that consisted of both state and federal agents. He further testified that approximately half of the officers in Group 2 were DEA specialists and the other half were local law enforcement officers. There was no hierarchy among them; all officers could apply for warrants, conduct surveillance, and do interviews. Joyner testified that when Group 2 investigated a drug crime, whether the case was "state" or "federal" depended on certain factors – for instance, the

quantities of drugs known to be involved, and the prior criminal history of the participants.[4]  As a

result, the officers were not always sure of how the case would go and whether it would be state

or federal.

Joyner testified that Group 2 started investigating Collier in 2013, but the investigation

went stale for about one year.  The investigation resumed in 2015 based on information received

from both state and federal confidential informants that led Group 2 to believe that Collier was

involved in drug trafficking.  As part of Group 2, Joyner participated in the physical surveillance

of Collier's vehicle at issue in the GPS warrant affidavit.  When Joyner applied for the GPS

warrant, no controlled buys had taken place, no drugs had been seized from Collier (or Lennie

Jackson, the alleged drug trafficking leader for whom Collier was a "right hand man"), no

federal wiretap authorization had been sought or obtained, and no Assistant United States

Attorney had been assigned to the case.  Joyner testified that while there was always a hope that

Group 2's work would result in federal charges, about forty percent of Group 2's cases which

actually resulted in charges were prosecuted in state court, and he had no reason at the time of

the GPS warrant application to presume that federal charges would follow.

Joyner testified that it was his decision to go to state court – and not federal court – for

the GPS warrant.  He stated that this "deliberate choice" was based on his knowledge and

understanding at the time, and that he was not "forum shopping."  The Court finds Joyner's

testimony credible, and that his position makes sense considering that when he applied for the

GPS warrant, Group 2's investigation of Collier was essentially (in Joyner's words) "starting

---

[4] Joyner testified that the larger the quantity of drugs that is recovered in an investigation, the more likely the investigation will result in a federal prosecution.  Similarly, if a federal wiretap investigation is involved, the case is considered "federal."  The parties do not seem to dispute that if a federal agent knows he is working on a federal case, he would be required to follow Rule 41 with respect to search warrant applications.

from the bottom," with no controlled buys, no drug seizures, no federal wiretapping, and no Assistant United States Attorney assigned or participating in the investigation. Moreover, as noted above, *see supra* note 3, the GPS warrant paperwork indicated that violations of both State of Michigan and federal law were being targeted, limited GPS monitoring to "within the State of Michigan," and referenced certain Michigan search warrant statutes, including M.C.L. §§ 780.651, 780.654, and 780.655. (*See, e.g.*, Doc. #58-1 at 2, 12; *id.* at ¶¶ 2, 3, 27, 28). Thus, the Court simply cannot conclude that the proceeding utilized by Joyner for obtaining the GPS warrant was a "federal" one requiring him to submit the warrant application to a federal judge.[5]

---

[5] At the outset of the evidentiary hearing, the Court asked Collier's counsel whether it was Collier's position that even in a purely "state" proceeding involving only state police officers and only potential state charges, a state court judge could not issue a GPS tracking warrant. While Collier's counsel tried mightily to avoid answering this question, in the end, he made clear that Collier was not espousing that position. As to this point, the Court notes:

> there is nothing in the Federal Rules of Criminal Procedure that suggests that in a joint federal-state law-enforcement investigation, all search warrants must be obtained under Federal Rule of Criminal Procedure 41(b). Stated differently, nothing in the Federal Rules of Criminal Procedure suggests that a joint task force cannot use either federal or state investigatory tools governed, respectively, by federal or state law. *See United States v. Sellers*, 483 F.2d 37, 43 (5th Cir.1973). Restricting warrants issued under state law to the requirements of Rule 41 in every joint investigation would "place officers acting jointly on the horns of a dilemma in deciding whether to charge state or federal crimes. Such officials should be free to make a considered choice based on the best available information and unencumbered by merely technical procedural rules." *Id.* at 44. We recognize, of course, that the decision with respect to the court in which charges are to be brought is often made by the Office of the United States Attorney and the state prosecutor, not the investigating officer.

*Claridy*, 601 F.3d at 282.

The Court recognizes the recent decision in *United States v. Martin*, No. 15-20544-02, 2016 WL 4493675, at *3 (E.D. Mich. Aug. 26, 2016), in which the Honorable Denise Page Hood wrote that the government had presented "no case law to support its position that a state court judge can issue a tracking warrant under Rule 41(b)(4)" and that "[a] plain reading of Rule 41(b)(4)

Accordingly, Collier's argument that the GPS warrant is invalid because it was procured in violation of Rule 41 lacks merit and is not grounds for suppressing any evidence.

### B. Even if Fed. R. Crim. P. 41 Applied and Was Violated, Suppression is not Warranted under the Exclusionary Rule

#### i. Application of the Exclusionary Rule

As mentioned above, Collier has not shown that Rule 41 applied to the GPS warrant and was violated in this case. But even if a Rule 41 violation was established, the application of the exclusionary rule would not result in suppression. Even where a search is subject to federal procedures, "a violation of Rule 41(b) does not 'implicate substantial rights to justify suppression.'" *United States v. Willoughby*, No. 3:10 CR 431, 2011 WL 6029074, at *4 (N.D. Ohio Nov. 15, 2011) (citing *United States v. Searp*, 586 F.2d 1117, 1124 (6th Cir. 1978)). "The use of the exclusionary rule to remedy statutory violations is a discretionary matter." *Hopper*, 58 F. App'x at 627 (citing *Searp*, 586 F.2d at 1123). Where state and federal officers conduct a joint search relying on a state search warrant, the Sixth Circuit has adopted two general guidelines on the application of the exclusionary rule. *Id.* First, the exclusionary rule should

---

fails to show that a state court judge has authority to issue a tracking warrant." While it is true that a state court judge cannot issue a GPS tracking warrant *under Rule 41*, *cf.* Fed. R. Civ. P. 41(b)(1) (authorizing state court judges to sign search warrants when a federal magistrate judge is not "reasonably available") and (b)(4) (which contains no such authorization where the warrant is for a "tracking device"), nothing in *Martin* suggests that the warrant application in that case was made pursuant to anything other than a *federal* proceeding. Indeed, the *Martin* opinion began by noting that "*[t]he ATF* was conducting an investigation of drug trafficking." *Martin*, 2016 WL 4493675, at *1 (emphasis added). The instant case is distinguishable because, as noted above, the investigation into Collier's activities was conducted jointly by federal and state authorities, and when Joyner applied for the GPS warrant, his reasonable belief was that he was not submitting the application as part of a federal proceeding. Thus, he was not required to submit the GPS warrant application to a federal judge. *See* M.C.L. § 780.651(1); *United States v. Jones*, 565 U.S. 400, 404-05 (2012) (holding that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.' . . . The Government physically occupied private property for the purpose of obtaining information. We have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted.").

only be considered if a "threshold standard" is met: the federal officers have violated a "Rule-embodied policy designed to protect the integrity of the federal courts or to govern the conduct of federal officers." *Id.* (quoting *Searp*, 586 F.2d at 1124). Relying on other federal courts' rulings, the Sixth Circuit has found that the "federal magistrates" and "court of record" requirements of Rule 41 are "Rule-based policies designed to protect the integrity of the federal courts" that satisfy the threshold standard. *Id.* (citing *United States v. Passero*, 385 F. Supp. 654 (D. Mass. 1974); *United States v. Perez*, 375 F. Supp. 332 (W.D. Tex. 1974)). Next, "[o]nce this threshold standard has been met, violations of Rule 41 alone still should not lead to exclusion unless": (1) there was "prejudice" – meaning that if the Rule had been followed, the search might not have occurred or would not have been so intrusive; or (2) there is evidence of "intentional and deliberate disregard of a provision of the rule." *Id.* (citing *Searp*, 586 F.2d at 1125).

Applying the Sixth Circuit's guidelines to this case, the threshold standard is met because Rule 41's requirements are at issue. The Court will therefore move on to the two-prong test for exclusion of evidence. As to the first prong, whether Joyner had gone to a state or federal judge, "[i]n either case . . . he would have received exactly what the Fourth Amendment requires: a neutral judicial officer determining probable cause existed before authorizing a search." *Willoughby*, 2011 WL 6029074, at *4. Moreover, while the GPS warrant was issued by a state judge for sixty days, which exceeds the forty-five-day limit in Rule 41(e), the GPS tracker results provided to the Court span less than thirty days – from April 28, 2015 through May 21, 2015.[6] Fed. R. Crim. P. 41(e); (Doc. #58-2). Thus, although the GPS warrant in question exceeded Rule

---

[6] Collier's Exhibit B is labeled "Results of a GPS Tracker Search Warrant for Collier's Cadillac." (Doc. #58-2). They show GPS data collected between April 28, 2015 and May 21, 2015 (*id.*), and Collier does not assert that these results are incomplete.

41's forty-five-day time limit, the GPS tracker was still operated within the time frame allowed under that Rule. As a result, there was no prejudice in this sense. Finally, in arguing that the GPS warrant should have been signed by a federal judge instead of by a state judge, "what [Collier] complains of is not a constitutional violation necessitating application of the exclusionary rule, but rather an alleged violation of a ministerial rule that does not implicate a substantial right" sufficient to justify suppression. *Willoughby*, 2011 WL 6029074, at \*4 (citing *Searp*, 586 F.2d at 1124-25) (recommending denial of the defendant's motion to suppress).

Regarding the second prong, there is no evidence that Joyner intentionally and deliberately disregarded Rule 41. Joyner testified that he had received training on Rule 41. He stated that when he applied for the GPS warrant, he acted on his knowledge at the time and believed that he had enough information to satisfy the probable cause standard. As discussed above, he testified that he did not know if the investigation would turn into a state or federal prosecution, and supported that testimony with specific facts, none of which Collier showed to be untrue. Joyner testified that he was not forum shopping. *See United States v. Duval*, 742 F.3d 246, 254-55 (6th Cir. 2014) (holding that the district court did not err in refusing to suppress evidence where a state officer working directly with the DEA as a "Task Force Agent" applied for a search warrant with a state judge, and the officer said that the decision to go to a state judge was motivated by what was known at the time and that when he applied for the search warrant, he did not know if the investigation was going to go state or federal). Because neither prong of the test for exclusion of evidence is met, suppression of the evidence is not warranted. *Hopper*, 58 F. App'x at 627-28 (concluding that denial of the motion to suppress was appropriate because neither of the two justifications for exclusion has been satisfied); *Claridy*, 601 F.3d at 283-84 (holding that even if a Rule 41 violation was found, as alleged by the defendant, it "would not

justify suppression of the evidence seized by the warrant" because the purported violations of Rule 41(b) were "nonconstitutional," "nonprejudicial," and no evidence has shown that they were an "intentional and deliberate effort to disregard or circumvent Rule 41").

      ii.    **Even if the GPS Warrant was not Supported by Probable Cause, Suppression is not Warranted Under the "Good Faith" Exception to the Exclusionary Rule**

      *a. Probable Cause*

Collier argues that the GPS warrant was not supported by probable cause, was overbroad, and lacked particularity. The government argues that Joyner's affidavit provided the requisite probable cause for a GPS tracking device. Keeping in mind that "[a] court must give great deference to the magistrate's determination that probable cause exists and not set aside the decision unless it was made arbitrarily," *Martin*, 2016 WL 4493675, at *3, the Court takes note of the relevant averments in Joyner's affidavit in support of the GPS warrant. Joyner referenced his training and experience with the DEA since February 2012, which included (1) participation in several investigations involving controlled substances, drug financing, and drug-money laundering; (2) education and instruction on narcotic investigations; and (3) familiarity with applicable laws under Title 21 of the United States Code. (Doc. #58-1 at ¶ 5). Prior to being at the DEA, he was a Lead Border Patrol Agent with the United States Border Patrol from March 2007 to October 2011. (*Id.*). Joyner relied on this training and experience in averring that a GPS tracking device would provide evidence of drug trafficking offenses and lead to admissible evidence. (*Id.* at ¶¶ 24-26). In addition, Joyner determined that Collier was the registered owner of the vehicle he sought to track and noted that surveillance revealed that it traveled within Michigan, often parking in Farmington Hills. (*Id.* at ¶ 4). Furthermore, Joyner relied on information from a confidential informant whose reliability was corroborated. (*Id.* at ¶¶ 11-12).

The confidential informant identified Collier as being involved in the distribution of drugs in the Detroit area and as being Jackson's "right hand man." (*Id.* at ¶ 12). Two cooperating defendants confirmed this identification. (*Id.* at ¶¶ 13-15).

Joyner's affidavit, however, was light on evidence corroborating the confidential informants' characterization of Collier. When the GPS warrant was issued, Group 2 had established surveillance on Collier's vehicle. (*Id.* at ¶¶ 17-22). Group 2 observed that Collier's vehicle was seen on Montana Street on multiple occasions. (*Id.* at ¶¶ 17-19, 21). On April 15, 2015, Collier was seen getting in to Jackson's vehicle before they both departed in separate vehicles. (*Id.* at ¶ 18). On April 23, 2015, a black Saturn Aura pulled up behind Collier's vehicle on Woodward Avenue in Detroit, and they both drove to the Montana Street location. (*Id.* at ¶¶ 20-21). The affidavit notes that the black Saturn Aura stayed at this address for approximately seven minutes "and drove well below the posted speed limit to his next destination," which Joyner states "are things [he] knows are indicative of a drug transaction." (*Id.* at ¶ 22). In addition, Joyner cited background checks made on Collier and on the driver of the black Saturn Aura, both revealing drug-related criminal histories. (*Id.* at ¶¶ 16, 23). Based on his personal experience and training, Joyner believed that the Montana Street address was a "stash house" and that Collier's vehicle was "being used to facilitate drug trafficking in the Detroit Metropolitan area." (*Id.* at ¶¶ 24-26). But during the evidentiary hearing, Joyner admitted that, prior to the execution of the GPS warrant affidavit, Collier had not been observed engaging in the actual purchase, sale, or transportation of drugs.

It is a close call whether the GPS warrant affidavit contained sufficient information to establish probable cause that Collier was committing drug-related crimes and that monitoring his

vehicle would advance the investigation and lead to admissible evidence. Regardless, the evidence in question should not be suppressed under the "good faith" exception.

### b. The "Good Faith" Exception to the Exclusionary Rule

Even assuming Joyner's affidavit failed to provide the requisite probable cause for the GPS warrant, the evidence seized should not be suppressed because Joyner and the other officers acted in good faith in connection with that warrant. In general, the Fourth Amendment's "exclusionary rule" provides that evidence seized pursuant to an invalid search warrant must be suppressed. *See Weeks v. United States*, 232 U.S. 383 (1914); *Mapp v. Ohio*, 367 U.S. 643 (1961). However, because "the purpose of the exclusionary rule, which is to deter police misconduct, will not be served by excluding evidence seized by an officer acting in good faith," *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005) (citing *United States v. Leon*, 468 U.S. 897, 916 (1984)), a "good-faith" exception to that rule exists. Thus, even if a search warrant is later held to be constitutionally deficient, evidence seized as a result of the search will not be suppressed if the officers executing the warrant had an "objectively reasonable" good-faith reliance on the magistrate judge's determination that probable cause existed. *Id.*; *Leon*, 468 U.S. at 905, 922. "In making this determination, all of the circumstances . . . may be considered." *Leon*, 468 U.S. at 922-23 n. 23. The United States Supreme Court has highlighted four situations where this "good faith" exception is inapplicable:

> first, if the issuing magistrate "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth;" second, if "the issuing magistrate wholly abandoned his judicial role;" third, if the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or in other words, where "the warrant application was supported by [nothing] more than a 'bare bones' affidavit," and, fourth, if the "warrant may be so facially deficient – i.e., failing to particularize the place to be searched or the things to be seized."

*United States v. Weaver*, 99 F.3d 1372, 1380 (6th Cir. 1996) (citations omitted) (quoting *Leon*, 468 U.S. at 914-15, 923).

Collier does not explicitly contest the application of the good faith exception to the search in question, but he maintains that the GPS affidavit and warrant lack probable cause and particularity. (Docs. #58 at 12-13; #65 at 5). Concerning the probable cause issue, the Sixth Circuit has noted that "whether an affidavit is so bare bones as to preclude application of the good-faith exception is a less demanding inquiry than the one involved in determining whether an affidavit provides a substantial basis for the magistrate's conclusion of probable cause." *United States v. Rose*, 714 F.3d 362, 367 (6th Cir. 2013) (internal citation omitted). Such an inquiry "requires examination of the affidavit for particularized facts that indicate veracity, reliability, and basis of knowledge and that go beyond bare conclusions and suppositions." *Id.* (internal citation omitted). This analysis is limited to "the four corners of the affidavit" without regard to the subjective mindset of the officers executing the warrant. *Id.* (internal citation omitted). The standard is satisfied where "the affidavit at least contained a minimally sufficient nexus between the alleged illegal activity [] and the places to be searched to support an officer's good faith belief in the warrant's validity." *United States v. Carney*, 675 F.3d 1007, 1012 (6th Cir. 2012) (citing *Leon*, 468 U.S. at 922 and *Carpenter*, 360 F.3d at 596).

A review of the instant warrant's supporting affidavit demonstrates that it satisfies the foregoing test. As stated above, Joyner determined that the 2005 Cadillac was registered to Collier. In addition, a criminal background check showed that Collier had three convictions: (1) on November 27, 1988 for "Dangerous Drugs," for which he was sentenced to between one and four years in prison; (2) on September 8, 1990 for carrying a concealed weapon, for which he was sentenced to one year of probation; and (3) on August 26, 1998 for distribution of cocaine

after selling three ounces of crack cocaine to an undercover DEA agent, for which he was sentenced to 120 months in federal prison. (Doc. #58-1 at ¶ 16). Joyner also explained that the confidential informant called "DEA-1" was a reliable source by noting that DEA-1 had provided detailed information to him and other law enforcement officers in the past that furthered narcotic investigations, the execution of several search warrants, and the seizure of over $70,000 and thirteen kilograms of cocaine. (*Id.* at ¶ 11).

Furthermore, the affidavit mentioned the physical surveillance of Collier's vehicle, which was observed to often park on Summit Drive and at Montana Street. During Group 2's physical surveillance of Collier's vehicle on April 23, 2015, a black Saturn Aura pulled up behind it and then followed Collier's vehicle to Montana Street. (*Id.* at ¶¶ 20-21). The affidavit states that a record check of the individual who was driving the black Saturn Aura revealed two convictions: (1) on May 30, 1991 for conspiracy to distribute controlled substances, resulting in a 169-month sentence; and (2) on May 31, 2005 for embezzlement, resulting in a jail sentence. (*Id.* at ¶ 23). Finally, the affidavit contained Joyner's averment, based on his training, experience and observations, that the cars in question were being driven in a manner indicative of drug trafficking activity. (*Id.* at ¶ 22). Taken together, the foregoing constitutes more than sufficient information for an objective officer to find the requisite nexus between Collier and drug trafficking activity involving his vehicle. *See United States v. Neal*, 577 F. App'x 434, 449 (6th Cir. 2014).

As to the particularity issue, "[t]he test for determining whether a search warrant describes the premises to be searched with sufficient particularity 'is not whether the description is technically accurate in every detail,' [] but rather whether the description is sufficient 'to enable the executing officer to locate and identify the premises with reasonable effort, and

whether there is any reasonable probability that another premises might be mistakenly searched.'" *United States v. Durk*, 149 F.3d 464, 465 (6th Cir. 1998) (internal citations omitted). "The evil that the framers of the Constitution were trying to eradicate with the particularity requirement was the so-called general warrant that allowed officers to search at random." *Id.* at 466. In this case, the situation is slightly different because the search warrant application in question was for a GPS tracker. Nevertheless, the warrant application was sufficiently particular: it provided the registration and Vehicle Identification Number of Collier's vehicle, which Joyner requested permission to attach a GPS tracker to. (Doc. #58-1 at ¶ 2). Accordingly, the good faith exception applies and Collier's motion to suppress should be denied.

**C.** **Alternatively to the Foregoing Analysis, the Evidence Obtained at the Summit Drive and Montana Street Locations Should Not be Suppressed under the "Independent Source Rule"**

Collier argues that because the GPS warrant allegedly lacked probable cause, "the subsequent [Summit/Montana warrant], based on information obtained improperly," violated Collier's rights under the Fourth Amendment. (Doc. #58 at 12). In his view, the evidence obtained as a result of this purported Fourth Amendment violation must be suppressed due to the "fruit of the poisonous tree doctrine." (*Id.*). That doctrine "bars the admissibility of evidence which police derivatively obtain from an unconstitutional search or seizure." *United States v. Williams*, 615 F.3d 657, 668 (6th Cir. 2010). But under the "independent source rule," "evidence will be admitted if the government shows that it was discovered through sources 'wholly independent of any constitutional violation.'" *United States v. Jenkins*, 396 F.3d 751, 757 (6th Cir. 2005). This analysis considers "the sufficiency of the untainted affidavit to see if probable cause exists without the tainted information." *Id.* at 760. "If the application for a warrant

'contains probable cause apart from the improper information, then the warrant is lawful and the independent source doctrine applies . . . .'" *Id.* at 758.

Here, the government points out that the Summit/Montana warrant "only included one reference to the results of the GPS tracking device." (Doc. #63 at 20). Indeed, the GPS tracker results are only mentioned in paragraph 23, which reads as follows:

> On April 25, 2015, Judge Mark W. Somers, 19th District Court, Dearborn, Michigan signed a State of Michigan search warrant authorizing the installation of a GPS tracker on COLLIER's 2005 Cadillac STS. A review of the electronic surveillance shows COLLIER's vehicle in the area of 202 W. Montana Street, Detroit, Michigan as well as 30249 Summit Drive, Farmington Hills, Michigan. The stops in the area of 202 W. Montana were during the day and evening hours. The stops in the area of 30249 Summit Drive were in the late evening until morning, which indicates to your affiant that COLLIER resides at 30249 Summit Drive, Farmington Hills, Michigan.

(Doc. #58-3 at ¶ 23).

But Sartori's affidavit contained other factual information which independently established the requisite nexus between Collier's alleged criminal activity and the Summit Drive and Montana Street locations. In paragraph 15 of the Summit/Montana warrant affidavit, Sartori noted that surveillance conducted in connection with the controlled heroin buy from Collier showed that immediately before the buy, Collier had been at "his residence located at 30249 Summit Drive," and that he drove from there to 202 W. Montana where he consummated the narcotics sale. (*Id.* ¶ 15). Thus, omitting paragraph 23 in its entirety would not change the fact that the Summit/Montana warrant contains sufficient probable cause for searching the two locations in question.

In connection with a separate motion Collier filed in this case challenging the Summit/Montana warrant application's sufficiency, the Honorable John Corbett O'Meara noted the Summit/Montana warrant's reference to the controlled buy described above. (Doc. #53 at 8).

As Judge O'Meara explained, the Sixth Circuit has held that "a single controlled purchase is sufficient to establish probable cause to believe that drugs are present at the purchase location." (*Id.*) (quoting *United States v. Archibald*, 685 F.3d 553, 558 (6th Cir. 2012)). And, as previously discussed, when it came time for the controlled buy, agents observed Collier depart his Summit Drive residence and drive to the Montana Street address where the buy took place. Again, even if the GPS tracker results are omitted, there is still enough information in the affidavit to establish probable cause for searching both the Summit Drive and Montana Street locations. Therefore, applying the independent source rule, the evidence obtained at those locations should not be suppressed. *See Jenkins*, 396 F.3d at 760.

## CONCLUSION

For all of the foregoing reasons, the Court **RECOMMENDS** that Collier's Motion to Suppress Evidence Based on Illegal Search and Seizure **(Doc. #58)** be **DENIED**.


Dated: September 15, 2017            s/David R. Grand
Ann Arbor, Michigan                  DAVID R. GRAND
                                     United States Magistrate Judge


## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to

this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 15, 2017.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager

Dated: September 15, 2017